UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| JUAN G. CORRAL, individually and as dependent administrator of, and on behalf of, AZAHLEA GUADALUPE DIAZ ZAMARRON,  minor A.E.C., the ESTATE OF AZAHLIA GISEL CORRAL, and AZAHLIA GISEL CORRAL'S heirs-at-law; and AZAHLEA GUADALUPE DIAZ ZAMARRON, individually, | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. 3:22-CV-160<br><br>JURY DEMANDED |
| Plaintiffs, | §<br>§ | |
| v. | §<br>§ | |
| EL PASO COUNTY, TEXAS; AMANDA D. BRINKS; JESSICA SAPIEN; STACIE MARIE TELLES; and VERONICA TINOCO, | | |
| Defendants. | | |

## PLAINTIFFS' ORIGINAL COMPLAINT

> **This is a case of a tragic pre-trial inmate suicide of 22-year-old Azahlia Corral, resulting from violation of constitutional rights.**

 

Table of Contents

I.   Introductory Allegations ...................................................................................... 4

   A.   Parties ................................................................................................... 4

   B.   Jurisdiction and Venue ........................................................................... 7

II.  Factual Allegations ............................................................................................. 8

   A.   Introduction ........................................................................................... 8

   B.   Azahlia's Predictable Suicide in the El Paso County Jail .................... 8

        1.   Witness Statements ...................................................................... 12

             a.   Aguilar, Rudy A. – Jailer ................................................... 12

             b.   Brinks, Amanda – Corporal/Jailer ..................................... 13

             c.   Marin, Irma L. – Jailer ....................................................... 16

             d.   Sapien, Jessica – Jailer ....................................................... 18

             e.   Telles, Stacie M. – Jailer .................................................... 19

             f.   Tinoco, Veronica – Jailer .................................................... 22

        2.   Death Reports .............................................................................. 24

             a.   Autopsy Report .................................................................. 24

             b.   Custodial Death Report (Filed with Attorney General) ........... 24

             c.   Inmate Death Report (Filed with Texas Commission on Jail
                  Standards) .......................................................................... 25

   C.   Investigations ...................................................................................... 25

        1.   Texas Rangers .............................................................................. 25

        2.   Texas Commission on Jail Standards .......................................... 26

   D.   Defendants' Knowledge and Education ................................................ 27

        1.   Jail Suicides are a Known, Widespread Problem. ...................... 27

        2.   Fifth Circuit's Long-Held Constitutional Standard:   Continuous
             Observation and Monitoring ....................................................... 28

   E.   *Monell* Liability of the County .......................................................... 29

        1.   Introduction ................................................................................. 29

        2.   County Policies, Practices, and Customs .................................... 30

        3.   TCJS Records Demonstrating County Practices and/or Customs ....... 33

        4.   Other Deaths Occurring at the El Paso County Jail .................... 40

        5.   EPCSO Custom and Practice of Retaining Unfit Employees ........... 45

III.    Causes of Action ..................................................................................... 52

    A.    14th Amendment Due Process Claims Under 42 U.S.C. § 1983: Objective Reasonableness Pursuant to *Kingsley v. Hendrickson* ................... 52

    B.    Remedies for Violation of Constitutional Rights .............................. 53

    C.    Cause of Action Against Individual Defendants Under 42 U.S.C. § 1983 for Violation of Constitutional Rights .............................................. 54

    D.    Cause of Action Against the County Under 42 U.S.C. § 1983 for Violation of Constitutional Rights ..................................................... 57

IV.    Concluding Allegations and Prayer ......................................................... 60

    A.    Conditions Precedent ...................................................................... 60

    B.    Use of Documents at Trial or Pretrial Proceedings ......................... 60

    C.    Jury Demand ................................................................................... 60

    D.    Prayer .............................................................................................. 60

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiffs file this complaint and for cause of action will show the following.

I.      Introductory Allegations

        A.      Parties

        1.      Plaintiff Juan G. Corral ("Juan Corral" or "Mr. Corral") is a natural person.  Mr. Corral is Azahlia Gisel Corral's natural and legal father.  Azahlea Guadalupe Diaz Zamarron ("Azahlea Zamarron" or "Ms. Zamarron") is Azahlia Gisel Corral's natural and legal mother. Minor A.E.C. is Azahlia Gisel Corral's natural and legal daughter.  Decedent Azahlia Gisel Corral is referred to herein at times as "Azahlia" or the "decedent."  Mr. Corral sues in his individual capacity and as the Dependent Administrator of the Estate of Azahlia Gisel Corral, Deceased.  Mr. Corral, when asserting claims in this lawsuit as the dependent administrator, does so in that capacity on behalf  of all other wrongful death beneficiaries (including Ms. Zamarron and A.E.C.), and he seeks all wrongful death damages available to those persons.  Those wrongful death beneficiaries are collectively referred to herein as the "Wrongful Death Beneficiaries."  Mr. Corral also does so in that capacity asserting claims on behalf of the estate and all of Azahlia's heirs (including Azahlia's heirs-at-law, including A.E.C.).  Those heirs are collectively referred to herein as the "Claimant Heirs."  Mr. Corral asserts claims on behalf of and seeks all survival damages and wrongful death damages available to Claimant Heirs and Wrongful Death Beneficiaries, including Mr. Corral, Ms. Zamarron, and A.E.C.  Mr., Corral and Ms. Zamarron also sue in their individual capacities and seek all wrongful death damages available to them. Letters of Dependent Administration were issued to Mr. Corral in or about March 2022, in Cause Number 2021-CPR01498, in the Probate Court Number 2, El Paso County, Texas, in a case styled *Estate of Azahlia Gisel Corral, Deceased.*

2.      Defendant El Paso County, Texas ("El Paso County" or the "County") is a Texas county.  El Paso County may be served with process pursuant to Federal Rule of Civil Procedure 4(j)(2) by serving its chief executive officer, Honorable County Judge Ricardo Samaniego, at 500 E. San Antonio, Suite 301, El Paso, Texas 79901, or wherever Honorable County Judge Ricardo Samaniego may be found.  Service on such person is also consistent with the manner prescribed by Texas law for serving a summons or like process on a county as a Defendant, as set forth in Texas Civil Practice and Remedies Code Section 17.024(a).  The County acted or failed to act at all relevant times through its employees, agents, representatives, jailers, and/or chief policymakers, all of whom acted under color of state law at all relevant times, and is liable for such actions and/or failure to act to the extent allowed by law (including but not necessarily limited to law applicable to claims pursuant to 42 U.S.C. § 1983).  The County's policies, practices, and/or customs were moving forces behind and caused, were proximate causes of, and were producing causes of, constitutional violations and resulting damages and death referenced in this pleading.

3.      Defendant Amanda D. Brinks (sometimes referred to herein as "Ms. Brinks," "Jailer Brinks," and "Corporal Brinks") is a natural person who resides and is domiciled in Texas. Amanda D. Brinks may be served with process at her likely work address, El Paso County Jail Annex, 12501 Montana Avenue, El Paso, Texas 79938.  She may also be served with process wherever else she may be found including, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Ms. Brinks at her dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Ms. Brinks is being sued in her individual capacity, and she acted at all relevant times under color of state law.  Her actions and inaction were moving forces behind, caused, and proximately caused constitutional violations and resulting damages and death referenced in this pleading.  Ms. Brinks was employed

by the County at all such times and acted or failed to act in the course and scope of her duties for the County.

4.      Defendant Jessica Sapien (sometimes referred to herein as "Ms. Sapien" or "Jailer Sapien") is a natural person who resides and is domiciled in Texas.  Jessica Sapien may be served with process at her likely work address, El Paso County Jail Annex, 12501 Montana Avenue, El Paso, Texas 79938.  She may also be served with process wherever else she may be found including, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Ms. Sapien at her dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Ms. Sapien is being sued in her individual capacity, and she acted at all relevant times under color of state law.  Her actions and inaction were moving forces behind, caused, and proximately caused constitutional violations and resulting damages and death referenced in this pleading.  Ms. Sapien was employed by the County at all such times and acted or failed to act in the course and scope of her duties for the County.

5.      Defendant Stacie Marie Telles (sometimes referred to herein as "Ms. Telles" or "Jailer Telles") is a natural person who resides and is domiciled, upon information and belief, in New Mexico.  Stacie Marie Telles may be served with process at her likely work address, El Paso County Jail Annex, 12501 Montana Avenue, El Paso, Texas 79938.  She may also be served with process wherever else she may be found including, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Ms. Telles at her dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Ms. Telles is being sued in her individual capacity, and she acted at all relevant times under color of state law.  Her actions and inaction were moving forces behind, caused, and proximately caused constitutional violations and resulting damages and death referenced in this pleading.  Ms. Telles

was employed by the County at all such times and acted or failed to act in the course and scope of her duties for the County.

6.       Defendant Veronica Tinoco (sometimes referred to herein as "Ms. Tinoco" or "Jailer Tinoco") is a natural person who resides and is domiciled in Texas.  Veronica Tinoco may be served with process at her likely work address, El Paso County Jail Annex, 12501 Montana Avenue, El Paso, Texas 79938.  She may also be served with process wherever else she may be found including, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Ms. Tinoco at her dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Ms. Tinoco is being sued in her individual capacity, and she acted at all relevant times under color of state law.  Her actions and inaction were moving forces behind, caused, and proximately caused constitutional violations and resulting damages and death referenced in this pleading.  Ms. Tinoco was employed by the County at all such times and acted or failed to act in the course and scope of her duties for the County.  All natural person Defendants in this case (Amanda D. Brinks, Jessica Sapien, Stacie Marie Telles, and Veronica Tinoco) are collectively referred to in this complaint as the "Individual Defendants."

B.       Jurisdiction and Venue

7.       The court has original subject matter jurisdiction over this lawsuit according to 28 U.S.C. § 1331 and 1343(4), because this suit presents a federal question and seeks relief pursuant to federal statute(s) providing for the protection of civil rights.  This suit arises under the United States Constitution and 42 U.S.C. § 1983.

8.       The court has personal jurisdiction over the County because it is a Texas county. The court has personal jurisdiction over the Individual Defendants because they reside and are domiciled in, are citizens of, and/or have sufficient contacts with Texas.

9.     Venue is proper in the El Paso Division of the United States District Court for the Western District of Texas, pursuant to 28 U.S.C. § 1391(b)(2).  A substantial part of the events or omissions giving rise to claims in this lawsuit occurred in the County, which is in the El Paso Division of the United States District Court for the Western District of Texas.

II.     Factual Allegations

A.     Introduction

10.     Plaintiffs provide in factual allegations sections below the general substance of certain factual allegations.  Plaintiffs do not intend that those sections provide in detail, or necessarily in chronological order, any or all allegations.  Rather, Plaintiffs intend that those sections provide Defendants sufficient fair notice of the general nature and substance of Plaintiffs' allegations, and further demonstrate that Plaintiffs' claim(s) have facial plausibility.  Whenever Plaintiffs plead factual allegations "upon information and belief," Plaintiffs are pleading that the specified factual contentions have evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.  Moreover, where Plaintiffs quote a document, conversation, or recording verbatim, Plaintiffs have done Plaintiff's best to do so accurately and without any typographical errors.  Plaintiffs also plead facts with give rise to conditions of confinement and/or episodic acts and/or omissions claims, as appropriate.

B.     Azahlia's Predictable Suicide in the El Paso County Jail

11.     Azahlia, only 22 years old, suffered a tragic, completely unnecessary death in the County jail in 2021.   Individual Defendants' deliberate indifference and objective unreasonableness in their actions and inaction caused, were proximate causes of, and were producing causes of Azahlia's suffering and death.  This section of the complaint provides only

some material facts related to Azahlia's suicide.   Plaintiffs set forth other material facts related to Azahlia's suicide in other sections of the complaint.

12.      Azahlia was processed into the El Paso County, Texas jail on February 13th, 2021, at approximately 10:35 PM. She was arrested on a failure-to-appear warrant out of New Mexico. The Texas Commission on Jail Standards - required Screening Form for Suicide and Medical/Mental/Developmental Impairments, after completion for Azahlia, indicated the following:

- Currently taking medication - yes- Risperidone.
- Disability/chronic illness - yes - depression, schizophrenia, and PTSD.
- Does inmate appear to be under drug/alcohol influence - yes - methamphetamine.
- History of drug/alcohol abuse - yes - methamphetamine used last Thursday.
- Withdrawal symptoms from use of medications or other substances - yes.
- Previous suicide attempt - yes - October 2020.
- Does inmate hear voices that others cannot hear - yes - auditory.
- Was inmate prior to arrest feeling down, depressed, or having little interest or pleasure in doing things - yes - depressed.
- Does inmate have nightmares, flashbacks, or repeated thoughts or feelings related to PTSD yes - flashbacks.
- Has inmate received services for emotional/mental health - yes - name of facility illegible.
- Has inmate been in a hospital for emotional/mental health in the last year? - yes – same illegible name as provided above.
- Is the diagnosis known from the prior hospitalization? - yes - depression, anxiety, schizophrenia, and PTSD.
- Does inmate show signs of depression? - yes - emotional flatness.
- Does inmate display unusual behavior or act or talk strangely - yes - cannot focus attention.

13.     The El Paso County Sheriff's Office ("EPCSO") knew, from these results, that Azahlia had significant mental health issues. Therefore, a judge was notified on February 13th, 2021 at approximately 11:05 PM. Further, during her custody, Azahlia was seen at the El Paso County Jail for her mental health issues on February 14, 2021, February 27, 2021 and March 1, 2021. Mental health assessments indicated that Azahlia suffered from depression, anxiety, insomnia, and PTSD. However, even so, it appears that mental health professionals at the jail did not prescribe, or assisting in securing prescriptions for, any mental health or sleeping medications at all for Azahlia.  This was a proximate cause of her death, due to uncontrolled suicidal ideation and an inability to sleep for several days before her death.

14.     On February 27, 2021, jail staff placed Azahlia on a 30-minute suicide watch. Such a watch is wholly insufficient.  Most inmates who commit suicide in county jails do so through use of a ligature. They form ligatures through a variety of objects, and when doing so, are able to commit suicide in approximately three minutes. Thus, anything short of continuous monitoring is mathematically insufficient to stop suicides.

15.     On March 1, 2021, jailers put Azahlia into a holdover cell.  This occurred just minutes after Azahlia attempted to rush past an officer, when exiting Azahlia's cell, and jump off the second tier of the housing area inside the jail.  Individuals Defendants all knew of this unambiguous suicide attempt.  Mental health staff evaluated Azahlia and decided, due to her clear intent to commit suicide, that she should be deprived of clothing and put into a suicide smock. Suicide smocks are designed to be used with suicidal people and are constructed in a manner such that they cannot be easily formed into a ligature.  Individual Defendants, despite this specific knowledge about Azahlia, put or allowed Azahlia to remain in a holdover cell, with tie-off points and clothing with which Azahlia could make a ligature.  They also knew that Azahlia was not

being continuously monitored.  Azahlia, no surprise to any Individual Defendant, used a jail-issued uniform pant leg to form a ligature.  She tied one end around her neck and the other end to a metal perforated partition, shown on the first page of this complaint, using one of the many holes in it. She then committed suicide.  There was absolutely no excuse for this occurring.

16.     A jail clinic note dated March 1, 2021, at 6:30 PM, indicates that Azahlia received a "psychotherapy" visit.  This occurred within a few minutes of her attempting to commit suicide by jumping over the rail on the second floor of the jail housing unit.  Azahlia's appearance was unkempt, her mood was anxious, and, as to hallucinations, the form indicated both auditory and visual.  The form indicated, as to her judgment, she has an impaired ability to make reasonable decisions.

17.     Azahlia answered "yes" to the question, "Do you ever think about dying?" Azahlia also answered "yes" to the question, "Do you ever think about killing yourself, or wish you were dead?" The mental health person reviewer did not provide any responses to the questions, "When you think about dying, do you have a plan about how to do it?" or, "Do you have the means to carry out your plan?" The form indicated that Azahlia had one prior suicide attempt. It also listed Azahlia's current suicide risk as "high."  This was obvious to all Defendants.

18.     The reviewer indicates that she met with Azahlia in the holdover cell in 1500. Jailer Tinoco informed the reviewer that Azahlia had tried to jump from the second tier floor. Azahlia said that she was withdrawing from fentanyl, and she said that she was using the drug while at the downtown El Paso County jail. Azahlia had been transferred form the downtown jail to the jail annex.  She further said that she had not been able to eat or drink anything in three days, and had not slept in five days. Notes indicate that Azahlia defecated on herself while being taken down after trying to jump from the second tier. She reported auditory hallucinations and suicidal

ideation. She expressed thoughts of hanging herself.  Azahlia was then taken to the medical clinic for further assessment, according to the note. The reviewer spoke with Sergeant Corporal Mendoza regarding Azahlia's situation and suicide attempt. The note concluded with, "Inmate was placed on clothing deprivation/SMOCK and will be scheduled to speak to a provider."

19.     The medical note, for a nurse's visit following the psychotherapy visit, contained a general comments section. The section reiterated that Azahlia had attempted to jump from the second tier at the jail in an apparent suicide attempt. It further indicated that Azahlia said she landed on her left side and shoulder, and her chin hit the floor, causing her pain. Azahlia was handcuffed while speaking to medical personnel. The medical note also indicated that Azahlia was not able to open and close her mouth due to dry, cracked lips. The note further read, "Patient does have severe dry cracking to her lips. Patient states that she has been peeling off the skin and has not been drinking water for 4 days."  The document indicates that Andrea De La Hoz conducted the medical examination.  It appears as if medical would take no action for these serious medical issues.

### 1.     Witness Statements

20.     Plaintiffs list in this section of the complaint relevant summaries of some material portions of witness statements provided by some individuals.  Plaintiffs intend that information in this section of the pleading, along with all other information in this pleading, support plausibility of Plaintiffs' claims.

### a.     Aguilar, Rudy A. – Jailer

21.      Jailer Rudy A. Aguilar provided a voluntary written statement to Investigator Omar Montoya with the El Paso County Sheriff's Office ("EPSCO"). He wrote that he was 28 years old

and had been employed by the EPCSO for the prior five months. He further wrote that, on March 1, 2021, at 7:00 PM, he arrived for duty at the El Paso County Jail annex. He was assigned to pod 1400 by Sergeant Quinonez. He was working with Acting Corporal Valdivia and officer Jesus Ramirez. He began his duty on floor with Acting Corporal Valdivia.

22.    At approximately 7:30 PM, he was told by Officer Ramirez to go to pod 1500 and relieve Jailer Sapian. He walked to pod 1500 and took over guard station duties at about 7:35 PM. He was briefed by Jailer Sapian that she was going to the floor to assist Corporal Brinks with a combative inmate. Jailer Aguilar was told that the officers were going to put a suicide smock on the combative inmate. The inmate was Azahlia.

23.    Jailer Aguilar was checking security cameras at about 7:37 PM, and he saw Azahlia, inside the pod's holdover tank, hanging from the privacy wall divider.  Upon information and belief, Jailer Sapien could have seen Azahlia committing suicide on the same security camera screen, but she chose not to look at it while on duty in the guard station.  Jailer Aguilar immediately told Jailer Sapian to go to the holdover tank and check on Azahlia. He saw Jailer Sapian run to the tank, and he then heard a backup call over the radio from the central officer. Jailer Aguilar began opening doors for responding officers to assist. He was also told to call the central officer and request EMS. Jailer Aguilar then continued with his duties as the guard station officer until he was released.

b.    Brinks, Amanda – Corporal/Jailer

24.    Jailer, and at times corporal, Amanda Brinks provided a voluntary written statement to investigator Victor Cordero with the EPCSO. Jailer Brinks wrote that she was 46 years old and had been employed by the EPCSO since 2003. She wrote that, in about year 2011, she was promoted to the rank of corporal.  She had been assigned to the EPCSO jail annex and to the El

Paso county detention facility. She was at the time of her statement assigned to the jail annex, Shift A, Team 1.

25.     She further wrote that, on March 1, 2021, she started her shift at approximately 7:00 P.M. She was assigned to work with Jailer J. Sapien and temporary Jailer C. Aguirre. They were assigned to pod 1500.

26.     When Corporal Brinks was heading to pod 1500, Sergeant Guzman told her that a female inmate assigned to pod 1500 was in the clinic. Sergeant Guzman said that when an officer was going to give the inmate [Azahlia] toilet paper, the inmate went at the officer and tried to jump off the top tier of the jail. Corporal Brinks knew that this was a suicide attempt.  The officer had to take down Azahlia, and Azahlia was taken to the clinic. Sergeant Guzman asked Corporal Brinks whether she wanted to check on the inmate on her way to pod 1500 due to Azahlia allegedly being combative.

27.     Corporal Brinks wrote that she walked the hallway toward the clinic. She then saw Jailer Telles escorting Azahlia through the clinic hallway. Corporal Brinks opened the clinic door for them, and they escorted Azahlia through the main hall back to pod 1500. Corporal Brinks then apparently observed Azahlia, handcuffed, wearing a red two-piece uniform and a white thermal top underneath her uniform top. As they escorted Azahlia, Corporal Brinks held Azahlia under her right arm, while Jailer Telles held her left arm. Corporal Brinks wrote, "The inmate appeared to be upset and said that she could not breathe." Azahlia also told them that they were walking too quickly.

28.     Corporal Brinks further wrote that they escorted Azahlia to the holdover cell in pod 1500. Jailer Telles told Corporal Brinks that Azahlia told the nurse she was having withdrawal

symptoms. Jailer Telles also told Corporal Brinks that Azahlia was going to be placed into a suicide smock and on a 15-minute observation schedule for her protection. Jailer Tinoco, from the prior shift, assisted them with Azahlia.  Jailer Telles said that she wanted to get her handcuffs that were on Azahlia. Jailer Tinoco then said she would assist Jailer Telles removing the handcuffs from Azahlia. Corporal Brinks asked them if they were okay, and they said "that they got it." Corporal Brinks wrote that she recalled the time as being 7:06 PM.

29.    Corporal Brinks, apparently attempting to avoid liability, wrote in part, "All of this had occurred before I settled in; I still had my backpack on and my beverage in hand." She wrote she then went to the front area of the guard station to put her backpack and beverage on a table. She then started sanitizing the work area as opposed to checking on Azahlia. She was briefed by Jailer Telles on the status of Azahlia. She then briefed her officers and told them "that inmate Corral was going to be on a 15 minute observation and placed in a smock."

30.    Corporal Brinks wrote that, at 7:10 P.M., she began the head count of the inmates assigned to pod 1500. All inmates were accounted for. She then made a visual observation of Azahlia and saw that she was on the bench, crying. Azahlia was no longer handcuffed. Corporal Brinks knew that Azahlia had clothing with which she could form a ligature, and that her hands were now free to do so.  She clearly knew that Azahlia was suicidal. Nevertheless, instead of doing something about it, Corporal Brinks wrote, "I then went to wash my hands and returned to check on inmate Corral at about 19:15. She was still crying and seated in the same place. Again at about 19:30, I visually checked on inmate Corral and she had not yet moved from the bench and was still crying."

31.    Corporal Brinks wrote that, at approximately 7:32 P.M., nurse Regina arrived in pod 1500 with the smock. The nurse said she was going to check another inmate for lice. Jailer

Aguirre escorted the nurse, and Corporal Brinks began a physical check of the inmates. When she was in cell block 20, she saw a "flash" coming from the guard station. This, she knew, was an indication of an emergency. She stopped her physical check and ran to the guard station. Jailer R. Aguilar was in the guard station and told her to go to the holdover cell.  Once there, she waw what would not have surprised her - Azahlia lying on the floor, unresponsive, after her suicide attempt. She noticed that Azahlia's face was blue, and she wrote, "I checked inmate Corral's carotid artery for a pulse and was not able to feel a pulse. I checked whether or not she was breathing; she was not." She concluded her statement by writing that EMS arrived at pod 1500, taking over care to attempt to save Azahlia's, life at 7:52 PM.

### c.    Marin, Irma L. – Jailer

32.    Jailer Irma L. Marin gave a voluntary statement to EPCSO Investigator Victor Corder. Jailer Marin's written statement indicated that she was 40 years old and had been employed by the EPCSO since 2011. She wrote that, on March 1st, 2021, she started her shift at approximately 11:30 AM. She was assigned to pod 1500 with Jailers Tinoco and Telles. She was on modified duty and assigned to the guard station. Their shift was to end at 7:00 PM.

33.    She wrote that she documented physical checks of inmates on a daily activity sheet. That sheet was kept in the guard station. Jailers Tinoco and Telles documented specific inmate observation checks in lockdown cells on inmate observation reports.

34.    Azahlia was placed on a 30-minute observation and assigned to cell 1519A. This was a single-person locked down cell. It was Jailer Marin's understanding that Azahlia was kept in that cell because she was sick with withdrawal symptoms.

35. At approximately 6:26 P.M., Jailer Marin saw Jailer Telles opening Azahlia's cell door, in order to hand toilet paper to Azahlia. Jailer Marin then saw Azahlia run out of her cell, climb on top of the second tier (floor) rail, and appear as if she was going to jump off. Jailer Marin then saw Jailer Telles grab Azahlia and take her to the floor of the second tier. Jailer Marin began opening the outer door to cell block 1520 so another officer could assist Jailer Telles. The electronic panel control screen flashed blue and temporarily malfunctioned. Jailer Marin was not able to use the intercom system, so she tried to get Jailer Tinoco's attention by calling her through the opening in the window of the guard station. At that time, the officer assigned to central security called Jailer Marin on the phone and asked about the control panel malfunction.

36. As Jailer Marin was talking to the central security officer, she saw Jailer Telles escorting Azahlia down the stairs. Jailer Telles called Jailer Tinoco for help. Jailer Tinoco asked Jailer Marin why she was not allowing Jailer Telles out of cell block 1520. Jailer Marin told Jailer Tinoco that the control panel was not working. Central security overrode the outer door of the cell block and opened the door for Jailer Telles. Jailer Tinoco escorted Azahlia to the holdover cell, while Jailer Telles continued with the physical check of the inmates. Jailer Marin could see that Azahlia was wearing a white thermal top and red jail-issued pants.

37. After Jailer Marin hung up with the central security officer, she called Audria, with Emergence Health Network in the jail, and told her that Azahlia attempted to try to jump off of the second tier. Audria said that she was on her way to check Azahlia.

38. At approximately 6:38 P.M., Audria arrived to check Azahlia in the holdover cell. At one point, Jailer Marin overheard Audria telling Jailer Telles and Jailer Tinoco that she was going to place Azahlia into a suicide smock. Jailer Marin then notified central security to override the side of the pod, so that Azahlia could be escorted to the clinic by Jailer Telles.

39.     Jailer Sapien, from the oncoming shift, met with Jailer Marin in the guard station. Jailer Marin briefed Jailer Sapien regarding the incident involving Azalia. She told Jailer Sapien that Audria was going to place Azalia into a suicide smock, but the order had not yet been received. Jailer Marin told Jailer Sapien that Azalia was in the clinic. Right after Jailer Marin finished briefing Jailer Sapien, she learned that Jailer Telles was back with Azalia. Jailer Marin documented that entry on the inmate in/out log, left the pod, and was off-duty.

d.      Sapien, Jessica – Jailer

40.     Jailer Jessica Sapien provided a voluntary written statement to Investigator Jorge Andrade with the EPCSO. Jailer Sapien wrote that she had been employed at the EPCSO for approximately one-and-a-half years, and that she was a jailer assigned to the Annex Detention Facility. Specifically, she was assigned to Sergeant Quinones' shift, currently working second shift, which is from 7:00 P.M. to 7:00 A.M.

41.     Jailer Sapien wrote that, on March 1, 2021, she arrived to work just before 7:00 P.M. She was assigned to work Pod 1500 with Corporal Brinks and Officer Aguirre. She was assigned to the guard station, and she relieved Officer Marin. Officer Marin told Jailer Sapien that Azahlia was at the clinic, because she had tried to assault officers in the pod. Officer Marin said that officers opened Azahlia's cell door, and she rushed them.

42.     At approximately 7:06 PM on March 1, 2021, Azahlia was taken back to Pod 1500 and placed into the holdover cell. Jailer Sapien wrote that Corporal Brinks and Officer Aguirre started the initial headcount, finishing it 10 minutes later at 7:16 PM. Jailer Sapien called the clinic and requested a suicide smock for Azahlia. Jailer Sapien wrote, "We use the smock on inmates that try to hurt themselves." She then contacted Sergeant Anaya and requested a couple officers to

assist Jailer Sapien with Azalia. Sergeant Anaya told her to get three officers from different pods. Therefore, she contacted Pods 1300, 1400, and 1600, asking each for one officer.

43. At 7:35 P.M., Officer Sapien was relieved at the guard station by Officer Aguilar. Corporal Brinks was conducting a physical check, and Jailer Sapien was going to go to the holdover cell to provide the suicide smock to Azahlia. Approximately two minutes later, Officer Aguilar advised her to go to the holdover cell and check on Azahlia, because she was "hanging." Jailer Aguilar could see Azahlia having by looking at the video screen in the same area in which Jailer Sapien had been working. Thus, upon information and belief, Jailer Sapien could have seen Azahlia committing suicide, and stopped it, if she had chosen to look at the screen.

44. Jailer Sapien went to the holdover cell and saw Azalia hanging from the metal divider. Azalia was on her knees, facing the metal divider, and had a pair of red pants wrapped around her neck. The divider and pants are depicted on the first page of this complaint. Jailer Sapien approached Azahlia and picked her up from under her arms. Azahlia was not making any noise and was very heavy. As she was holding Azahlia, she untied the knot around her neck and placed Azahlia on her back. By then, Corporal Brinks had arrived at the holdover cell. Backup was called, and several officers arrived to assist.

### e.     Telles, Stacie M. – Jailer

45. Stacie M. Telles provided a voluntary written statement to Victor Cordero with the EPCSO. Jailer Telles indicated that she was 27 years old and had been employed by the EPCSO since 2019 as a jailer. She was currently assigned to the jail annex, Shift B, Team 2.

46. She wrote that, on March 1, 2021, she started her shift at approximately 7:00 A.M. She was assigned to pod 1500 with jailers I. Marin and V. Tinoco. Their shift ended at 7:00 P.M.

47.     She wrote that, throughout their shift, they conducted physical checks of inmates and observation checks of inmates in lockdown cells. Physical checks were documented on a daily activity report, while observation checks of specific inmates were documented on inmate observation reports. She wrote that Azahlia was an inmate put on a 30-minute observation schedule due to being suicidal. Upon information and belief Jailers Telles, Marin, and Tinoco all knew that Azahlia was on a suicide watch. Jailer Telles wrote that part of a 30-minute observation was to be sure that Azahlia did not have any sharp objects on her person or in her cell, to ensure her safety. While Ms. Telles did not write as much, she and all other Individual Defendants knew that the most common way for an inmate to kill herself is through use of a ligature fashioned from jail clothing, bedding, torn mattresses, and/or phone cords. Jailer Telles wrote that Azahlia was assigned to sell 1519A, a single-person locked-down cell.

48.     She also wrote that, at approximately 6:26 P.M., she was conducting a physical check of inmates. She had placed a roll of toilet paper by Azahlia's cell, because Azahlia had requested it. When she opened Azahlia's cell door to hand her the toilet paper, Azahlia asked to go to the clinic. Jailer Telles told Azahlia that she would have to wait for the clinic to call first. Azahlia then asked to go to the shower, but was told that she had already had her hour of rotation. Then, Azahlia pushed the cell door open and ran away from Jailer Telles toward the rails of the second tier at the jail. Jailer Telles saw Azahlia climb onto the rails as if she was going to jump down to the bottom floor, in an apparent suicide attempt. Jailer Telles secured her scanner ("pipe") and pod keys onto her duty belt, and grabbed Azahlia quickly, taking her to the floor of the second tier "to prevent her from jumping or falling." She then handcuffed Azahlia "for her safety and to prevent her from harming herself." She then escorted Azahlia down the stairs. Azahlia "was wearing a

white thermal top, red uniform pants and socks." Jailer Telles called for Jailer Tinoco, and Jailer Tinoco took Azahlia to a holdover cell. Jailer Telles continued with physical checks of inmates.

49.     Audria came to pod 1500 and checked Azahlia in the holdover cell. As a result of that discussion, and information about Azahlia trying to jump from the second floor, Audria said that she was going to initiate 15-minute observation paperwork for Azahlia. Jailer Tinoco told Jailer Telles that Azahlia had soiled her uniform pants. Therefore, even though knowing that Azahlia was suicidal, Jailer Telles wrote, "I provided Inmate Corral a clean uniform (top and pants) and a pair of shoes." This was clothing which Jailer Telles knew could be fashioned into a ligature. She then escorted Azahlia to the clinic, where she was seen by Nurse De La Hoz. Nurse De La Hoz checked Azahlia for injuries. Jailer Telles heard Azahlia tell Nurse De La Hoz that Azahlia felt nauseous and was having withdrawal symptoms from drugs. Upon information and belief, this was at least in part from fentanyl taken in the El Paso County downtown jail.  Azahlia asked Nurse De La Hoz for pain medication. After Nurse De La Hoz finished her consultation with Azahlia, Jailer Telles began to escort Azahlia back to pod 1500.

50.     Jailer Telles met with Corporal Brinks from the oncoming shift. Jailer Telles asked Corporal Brinks if Corporal Brinks was in pod 1500. Corporal Brinks affirmed that she was in pod 1500. Corporal Brinks then said that she would finish taking Azahlia back to the pod and, in substance, that Jailer Telles did not need to do so. Jailer Telles then told Corporal Brinks that Azahlia was secured with Jailer Torres's handcuffs, and that Jailer Telles would assist Corporal Brinks in escorting Azahlia back to the pod so the handcuffs could be retrieved. She wrote, "(Corporal) Brinks assisted me escorting Inmate Corral to the holdover cell and I briefed her on the incident with Inmate Corral." She then wrote, "I escorted Inmate Corral into the holdover cell. Inmate Corral was wearing a two piece uniform, with a white thermal top, socks and shoes. DO

Tinoco and (sic) was present when I took the handcuffs off Inmate Corral. Before I left, I heard DO Tinoco asking (Corporal) Brinks if they printed out the 15-minute observation card for Inmate Corral or if they had the classification officer print it out. Corporal Brinks told DO Tinoco that she would take care of that. I then left and was off duty." However, simply leaving the jail would not absolve her of liability. In fact, leaving Azahlia unobserved in a cell with known tie-off points and clothing with which she could form a ligature was deliberately indifferent and objectively unreasonable.

### f.      Tinoco, Veronica – Jailer

51.      Jailer Veronica Tinoco provided a written statement to investigator Elizabeth Avila with the EPCSO. Jailer Tinoco indicated that she was 32 years old and had been employed by the EPCSO since June, 2019. She was assigned at the time to the EPCSO jail annex, Shift B, Team 2.

52.      Jailer Tinoco wrote that, on March 1, 2021, she started her shift at about 7:00 A.M. She was assigned to pod 1500 with jailers S. Telles and I. Marin. Jailer Marin arrived to begin work at 11:00 A.M., so Corporal Ramirez was temporarily assigned to pod 1500. Their shift ended at 7:00 P.M.

53.      Jailer Tinoco also wrote that pod 1500 is a female inmate lockdown pod. Jailers, pursuant to policy or custom, were to conduct physical checks every 25 minutes, documenting such on the daily activity sheet and "pipes" system where doors are scanned. Inmates that are under suicide observation were checked every 30 minutes, and those checks were to be documented on the suicide observation sheet. They began their physical checks by starting with the current suicide observation inmates, so they checked them every 25 minutes. She wrote that Azahlia was an inmate under suicide observation, assigned to cell 1519A.

54.     Jailer Tinoco wrote that, during the 6:25 P.M. physical check, Jailer Telles conducted the check at cell block 1520. Jailer Tinoco was on the phone with another officer when she heard someone yell, "Tinoco!" She turned around and saw Jailer Telles and Azahlia standing in the day room. She told jailer Marin to override the inner vestibule door to allow Jailer Telles to exit the cell block. Jailer Marin said that the panel had malfunctioned and would not allow her to open that door. She then asked Jailer Marin for the emergency vestibule keys to manually open the door. While Jailer Marin was looking for the keys, the computer system cycled and finally opened the inner vestibule door. Jailer Tinoco wrote, "DO Telles asked me to take custody of inmate Corral while she finished the physical check."

55.     Jailer Tinoco wrote that she escorted Azahlia to the holdover cell. She asked Azahlia what she was doing, and Azahlia said she wanted to die. She wrote that she "counseled" Azahlia and placed her in the holdover cell. Azahlia then told her that she had soiled herself, and jailer Tinoco told Azahlia that she would get her a change of pants. However, she said that she first had to secure Azahlia in the cell.

56.     Jailer Tinoco also wrote that soon thereafter, Emergence Health Network caseworker Audria arrived on the floor and met with Azahlia. Jailer Tinoco overheard Azahlia ask Audria if Azahlia was going to be seen at the clinic. Audria told Azahlia that she was on the sick call list and would be seen later that night. Azahlia asked if the nurse was a prescribing nurse, and she was told that the nurse could not prescribe. Jailer Telles provided Azahlia with a clean uniform set, because Azahlia was only wearing a thermal top. Jailer Telles removed the handcuffs and allowed Azahlia to clean herself up. Azahlia was later escorted by jailer Telles to the clinic.

57.     At shift change, Jailer Tinoco was briefing a temporary jailer, however, she could not recall her name. She briefed her about the incident with Azahlia and about "the other suicide

observation inmates that [they] currently" had incarcerated. She told the temporary jailer that Azahlia was going to be placed on a 15-minute suicide observation "with clothing deprivation." After completing that briefing, Jailer Tinoco saw Corporal Brinks and Jailer Telles returning to the pod with Azahlia, escorting her to the holdover cell. Jailer Tinoco wrote that Corporal Brinks "was relieving us in pod 1500 for the graveyard shift." Jailer Tinoco wrote that she briefed Corporal Brinks on the incident with Azahlia. She asked Corporal Brinks if Corporal Brinks needed assistance in getting the smock for the clothing deprivation for Azahlia, and Corporal Brinks "advised [them] she would take care of it."

### 2.    Death Reports

#### a.    Autopsy Report

58.    The County of El Paso Office of the Medical Examiner and Forensic Laboratory conducted an autopsy of Azahlia. The cause of death was listed as anoxic encephalopathy due to hanging. The manner of death was listed as suicide. The deputy medical examiner conducting the autopsy was Juan U. Contin, M.D.

#### b.    Custodial Death Report (Filed with Attorney General)

59.    James Belknap, with the EPCSO, filed a custodial death report regarding Azahlia's death with the attorney general of Texas. The report listed as the time of the incident 7:37 P.M. on March 1, 2021, and Azahlia's death occurring at 11:16 A.M. on March 6, 2021. It listed the jail's address as 12501 Montana Drive in El Paso. The report admitted that Azahlia exhibited mental health problems and made suicidal statements. It also admitted that Azahlia did not threaten anyone, including law enforcement officers, and did not ever attempt to gain possession of any officer's weapon. A summary further admits that when Azahlia was in the holdover cell, which

had tie-off points and items with which Azahlia could form a ligature, she was only on a 15-minute "observation suicide watch." Pursuant to El Paso County policy, she was not on a constant watch. The summary portion of the report also reads in partal, "Corral was observed hanging from the privacy wall by her jail issued pants."

c.      Inmate Death Report (Filed with Texas Commission on Jail Standards)

60.     Detective Victor Cordero, with the EPCSO, filed an inmate death reporting form with the TCJS. He did not do so until three days after Azahlia's death. In the form, he indicated that the last face-to-face contact with Azahlia before her suicide was at 7:30 P.M. on March 1, 2021, such contact being by Corporal Amanda Brinks (#4089). He also indicated in the form that Jailer Jessica Sapien (#9134) was the person who found Azahlia after her suicide attempt. The form admitted that Azahlia was on suicide watch at the time she was left in a cell, unmonitored, with items with which she was able to form a ligature, and which had tie-off points. The form further admitted that Azahlia was found only seven minutes after the 7:30 P.M. check.  Thus, as shown elsewhere in this complaint, anything other than continuous monitoring of a suicidal inmate is pointless, unreasonable, and deliberately indifferent. The form further admits that Azalia was hanging from a privacy wall by her jail-issued pants.

C.      Investigations

1.      Texas Rangers

61.     As indicated above, the Texas Rangers investigated the decedent's death.  The purpose of a Texas Rangers investigation regarding a custodial death, such as that of the decedent, is to determine whether there was any criminal responsibility for what occurred.  Texas Rangers do not determine whether there is civil liability for violation of a person's constitutional rights,

such as that alleged in this case. Therefore, the Texas Rangers' determination as to whether to turn the case over to a grand jury and recommended prosecution does not determine whether Defendants are liable for the decedent's death.

62.     Ranger Sanchez was notified by the El Paso County Sheriff's Office, on March 9, 2021, regarding Ms. Corral's death. It appears to be odd at best that El Paso County would not have notified the Ranger on the day of Ms. Corral's death. Regardless, Ranger Sanchez provided a summary indicating his understanding of what occurred. He wrote in part that, on March 1, 2021, at approximately 6:40 p.m., Azahlia attempted to jump off of the second tier at the jail. However, a detention officer was able to keep Azahlia from doing so, and also to subdue her. Azahlia was then taken to the jail's medical clinic for evaluation. Azahlia said that she planned to kill herself. Regardless, Azahlia was escorted back to a cell and placed under 15-minute observation suicide watch. Less than an hour after the original incident, at approximately 7:37 p.m., jailers responded to an emergency call at the cell in which Azahlia was being kept. Azahlia was seen hanging from a privacy wall by her jail-issued pants. EMS personnel ultimately transported Azahlia to a local hospital. She was on life support for a period of time and ultimately passed away at 11:16 A.M. on March 6, 2021. Ranger Sanchez obtain copies of a number of written statements provided by jailers, some relevant portions of which are referenced in this pleading. He also obtained evidence including a scene diagram, scene photographs, autopsy photographs, and a copy of an autopsy report.

## 2.     Texas Commission on Jail Standards

63.     The Texas Commission on Jail Standards ("TCJS") has, as mentioned elsewhere in this pleading, specific minimum standards. Those standards do not generally address all details of what happens in Texas county jails. They also do not detail or direct that specific medical and/or

mental health care be given to inmates in certain circumstances.  Thus, jails and jailers can violate the Constitution even if they do not violate certain, specific minimum standards.  However, violation of a standard is some evidence of a constitutional violation.

      D.     Defendants' Knowledge and Education

          1.     Jail Suicides are a Known, Widespread Problem.

64.     Defendants knew that prisoners frequently commit suicide through hanging and/or asphyxiation, using items in their cells to form ligatures.  They also knew that this is the most common method for prisoners to commit suicide.  Individual Defendants possessed this knowledge simply from hearing news media reports over the years, as well as through their experience, training, and/or education.  Thus, Defendants should not have allowed the decedent to have in the cell items with which the decedent ultimately committed suicide.

65.     Jail suicides, as all Defendants knew before incarcerating the decedent, are a huge problem in the United States.  One-thousand fifty-three (1,053) people died in local jails in 2014, three-hundred seventy-two (372) of which died as a result of suicide.  Defendants also knew when incarcerating the decedent that most jail suicides occur by hanging/strangulation, with inmates using objects available to them as ligatures.  Inmates commonly use bed linens, mattresses, clothing (including drawstrings), telephone cords, and trash bags.

66.     The TCJS specifies use of the Screening Form for Suicide and Medical/Mental/Developmental Impairments (referenced above) to assist in identifying suicidal inmates.  The screening form was drafted to achieve, as one of three goals, the creation of an objective suicide risk assessment with clear guidance for front-line jail personnel as to when to notify their supervisors and/or mental health providers and magistrates.  The TCJS indicates that intake screening "is the first step and is crucial to determine which inmates require more

specialized mental health assessment."  Moreover, "Unless inmates are identified as *potentially* needing mental health treatment, they will not receive it."

67.     The TCJS also notes that purposes of intake screening are to enable correctional staff to triage those who may be at significant risk for suicide; identify prisoners who may be in distress for a mental health disorder/psychosis or complications from recent substance abuse; and assist with the continuity of care of special-needs alleged offenders.  The TCJS requires that an intake screening form be completed for all prisoners immediately upon admission into a jail facility.  Further, staff should perform additional screenings when they have information that a prisoner has developed mental illness, or the inmate becomes suicidal, at any point during the inmate's incarceration.  A jail must maintain any such additional screening forms in a prisoner's file.

<u>2.     Fifth Circuit's Long-Held Constitutional Standard:     Continuous Observation and Monitoring</u>

68.     Circuit Judge Goldberg, writing a concurring opinion on behalf of the United States Court of Appeals for the Fifth Circuit nearly 30 years ago – in 1992 – unambiguously wrote that the right to continual monitoring of prisoners with suicidal tendencies was clearly established.  In *Rhyne vs. Henderson County*, 973 F.2d 386 (5th Cir. 1992), the mother of a pre-trial detainee brought suit for the death of her child.  Judge Goldberg warned and put on notice all policymakers within the jurisdiction of the United States Court of Appeals for the Fifth Circuit regarding pre-trial detainees in need of mental health care (and specifically those with suicidal tendencies):

> Fortunately, the policymakers in charge can learn from their mistakes and take the necessary additional steps to insure the safety of pretrial detainees in need of mental health care. **Other municipalities should also take heed of the tragic consequences which are likely to ensue in the absence of adequate safety measures to deal with detainees displaying suicidal tendencies.**

**What we learn from the experiences of Henderson County [Texas] is that when jailers know a detainee is prone to committing suicide, a policy of observing such a detainee on a periodic, rather than on a continuous, basis, will not suffice**; that vesting discretion in untrained jail personnel to assess the need for, and administer, mental health care, will not be responsive to the medical needs of mentally ill detainees; and that delegating the task of providing mental health care to an agency that is incapable of dispensing it on the weekends will endanger the well-being of its emotionally disturbed detainees. **We need not remind jailers and municipalities that the Constitution works day and night, weekends and holidays—it takes no coffee breaks, no winter recess, and no summer vacation**.

So the plaintiff in this case did not prove that Henderson County adopted its policy of handling suicidal detainees with deliberate indifference to their medical needs. But that does not insulate Henderson County, or any other municipality, from liability in future cases. **Jailers and municipalities beware! Suicide is a real threat in the custodial environment. Showing some concern for those in custody, by taking limited steps to protect them, will not pass muster unless the strides taken to deal with the risk are calculated to work: Employing only "meager measures that [jailers and municipalities] know or should know to be ineffectual" amounts to deliberate indifference. To sit idly by now and await another, or even the first, fatality, in the face of the Henderson County tragedy, would surely amount to *deliberate* indifference.**

*Id.* at 395-96 (emphasis added).

Defendants were put on notice long ago that anything short of continuous monitoring of suicidal inmates was insufficient and violated the United States Constitution.  The law was clearly established with exacting specificity, and Defendants were charged with knowledge of it.

       E.       <u>*Monell* Liability of the County</u>

             1.       <u>Introduction</u>

69.     Plaintiffs set forth in this section of the pleading additional facts and allegations supporting liability claims against the County pursuant to *Monell v. Department of Soc. Svcs.,* 436 U.S. 658 (1978).  It is Plaintiffs' intent that all facts asserted in this pleading relating to policies, practices, and/or customs of the County support such *Monell* liability claims, and not just facts and allegations set forth in this section.  Such policies, practices, and/or customs alleged in this

pleading, individually and/or working together, were moving forces behind and caused the constitutional violations, and damages and death, referenced herein. These policies, practices, and/or customs are pled individually and alternatively. The County knew, when it incarcerated the decedent, that its personnel, policies, practices, and/or customs were such that it could not meet its constitutional obligations to provide appropriate mental health treatment to, and protect, the decedent. The County made decisions about policy and practice which it implemented through its commissioner's court, its sheriff, its jail administrator, and/or through such widespread practice and/or custom that such practice and/or custom became the policy of the County as it related to its jail. The Fifth Circuit Court of Appeals has made it clear that Plaintiff need not allege at the pleading stage the identity of the County's chief policymaker.

70.     There were several policies, practices, and/or customs of the County which were moving forces behind, caused, were producing causes of, and/or proximately caused the decedent's suffering and death, and other damages referenced in this pleading. The County made deliberate decisions, acting in a deliberately indifferent and/or objectively unreasonable manner, when implementing and/or allowing such policies, practices, and/or customs to exist. Further, when the County implemented and/or consciously allowed such policies, practices, and/or customs to exist, it knew with certainty that the result would be serious injury, suffering, physical illness, and/or death.

### 2.      County Policies, Practices, and Customs

71.     Plaintiffs list beneath this heading County policies, practices, and/or customs which Plaintiffs allege, at times upon information and belief, caused, proximately caused, were producing causes of, and/or were moving forces behind all damages referenced in this pleading, including the decedent's death. Thus, the County is liable for all such damages.

72.     El Paso County had, at the time of the incident, a written post order for the housing and guard station officer. That post order contained a section entitled Mental Disabilities and Suicide Pprevention. The guard station officer was, pursuant to that section, required to recognize inmates with suicidal tendencies. Unfortunately, that section required, even for inmates with suicidal tendencies, only staggered checks of an inmate.  Staggered checks are insufficient for a suicidal inmate, as it takes only approximately 3 minutes to commit suicide through use of a ligature. Moreover, that written policy said that the person at that post, "if necessary" for the safety of the inmate, could remove clothing embedding, razors, writing implements, or other property that "may cause bodily injury" until an inmate is stabilized. This permissive, rather than mandatory, policy was unreasonable and deliberately indifferent to the fact that a suicidal inmate will use such items to harm herself. In fact, use of a ligature is the most common way for inmates to commit suicide. Further, the written policy required a shift supervisor or medical staff to authorize removal of clothing and/or bedding. This policy did not allow jailers to perform their duties in a manner ensuring safety of suicidal inmates.

73.     El Paso County Jail had a policy, practice, and/or custom of not allowing inmates on suicide watch to have sharp items such pens, pencils, and razors, but which did allow them to have linens and uniforms. This is nonsensical and leads to suicides through use of ligatures formed with the most common items used by inmates - linens and uniforms.  Azahlia was placed on suicide watch, for example, on or about February 13, 2021, and a document entitled El Paso County Jail Inmate Special Medical Instructions Withdrawal Observation read in part, "Inmate is not to have any sharps such as: pens, pencils, razors, etc. Inmate may have linens and uniforms."  Another similar form, indicating a review date of March 13, 2021, and entitled, "El Paso County Jail Inmate Special Medical Instructions," indicated that there was a flag to be placed in the electronic records

system (for Azahlia) "for suicide observation and [mental health] track." Even so, Azahlia, pursuant to apparent policy, practice, and/or custom, would not be allowed pencils, pens, razors, or similar sharp items, but would be allowed linens and ultimately a uniform with which she would commit suicide.

74.    The County had a policy, practice, and/or custom of not continuously observing inmates who are at significant risk of self-harm.  That policy, practice, or custom clearly also applied to suicidal inmates, such as Azahlia.  She was put on a 15-watch as a result of being actively suicidal.  Even for those inmates on suicide watch, the policy called for 30-minute checks. This allowed an inmate to commit suicide, in 3 minutes after a check, and then no be found for 27 more minutes.

75.    The County had a policy, practice, and/or custom of putting inmates on suicide watch, and even those who had just attempted suicide (such as Azahlia), into cells with tie-off points and items (clothing and bedding) with which they could form ligatures.  This was clear deliberate indifference, and it was objectively unreasonable.

76.    Upon information and belief, the County had a significant, known problem with illegal drugs (including fentanyl) being distributed among prisoners in its jail.  This led to and was a cause of Azahlia's mental health issues, suffering, and death.

77.    Upon information and belief, the County had a policy, practice, and.or custom of not assuring that needed mental health medications were prescribed and administered to inmages with serious mental health issues.  The TCJS determined that, despite mental health personnel meeting with Azahlia at times during her incarceration in the County jail, no medications were prescribed as a result.  This led to and was a cause of Azahlia's suffering and death.

78.     Upon information and belief, the County had a policy, practice, and/or custom of not sharing with jailers charged with prisoner observations information contained on the one-page TCJS mental and medical health intake form.  Jailers, being kept in the dark, would not be able to triage and better observe prisoners under their care.

79.     Upon information and belief, the County did not reprimand, require additional training or education of, write-up, or terminate any person, including Individual Defendants, for not continuously monitoring Azahlia in the holdover cell, and allowing Azahlia to be in a cell with tie-off points and clothing with which she could form a ligature, while Azahlia was actively suicidal.  This confirms that Individual Defendants acted consistent with pre-existing policy, practice, and/or custom.

### 3.     TCJS Records Demonstrating County Practices and/or Customs

80.     TCJS reports and documents regarding inspections of the County jail further demonstrate these and other policies, practices, and/or customs which, when applied individually and/or working together, caused, were proximate causes of, and/or were producing causes of damages and death asserted in this pleading.  The TCJS documents also show that the County was put on notice of deficient policies, practices, and customs well before the decedent's death. Documents for inspections after the decedent's death are some evidence of pre-existing policies, practices, and/or customs.

81.     The Texas Commission on Jail Standards (TCJS) inspected the El Paso County Jail from June 6 through 10, 2011. The inspectors had to provide technical assistance to the jail related to completion of suicide prevention screening forms. When inspectors reviewed random inmate medical files, inspectors learned that some of the suicide prevention screening forms had not been completed in their entirety. Inspectors required that the jail ensure that all dates and times

are completed where required, and as well that all continuity of care information be maintained in inmate medical folders. TCJS inspectors also determined that Commander Colorado had not submitted an L-1 form to the Texas Commission on Law Enforcement Standards. Thus, he was working in the jail without a license.

82.     The TCJS inspected the El Paso County Jail again from June 4 through 8, 2012. When walking through the downtown jail, TCJS inspectors discovered that there were both classified and non-classified inmates being held in the processing area together. Classified inmates in court transfer must be kept separated from unclassified inmates, and they must be held according to classification. TCJS inspectors had to assure the classified inmates were immediately removed from holding cells and placed into appropriate holding areas. Obviously, the failure to classify inmates and/or to hold classified inmates in improper areas can lead to serious injury or death.

83.     The TCJS inspected the El Paso County Jail again from June 2, through 6, 2014. TCJS inspector determined that at both jail facilities, on the day of inspection, there was no documentation of how special needs screeners verify that possible matches are in fact not an inmate in question (in reference to a Continuity of Care Query). TCJS inspectors had to remind the jail that it is imperative that verification is made and documented as to how verification is completed. The inspector asked that, as a screener reviews a record, he or she should highlight all identifiers that do not match booking information received for the inmate. When the screener sees any possible match or positive match, the screener must ensure that a judge is notified and documentation maintained for inspection review. Further, if the screener cannot positively verify that a match is not made, the jail must notify a judge regardless.

84.     The TCJS inspected the El Paso County Jail again from June 1 through 4, 2015. After reviewing licensing for all jailers employed at the El Paso County Detention Center and the

El Paso County Jail, TCJS inspectors determined that Commander Flores and Catherine Martinez were working at the jail without either an active jailer's license or temporary jailer's license. In addition to operating jails without licensed jailers, TCJS inspectors learned that jailers would at times exceed the maximum 60-minute observation period for typical inmates. Even more troubling, when walking through the downtown jail, an inspector found that an observation sheet for an inmate on suicide watch had pre-printed times for visual checks. This was falsification of a government record, which is a felony. The inspection team had to discuss with El Paso County jail administration how pre-printed times could come into conflict with real-time notation of rounds as well as the video evidence. This should have gone without saying. TCJS inspectors were being kind in advising El Paso County jail management as to how to keep employees from committing felonies through falsification of jail records. This falsification led to placing inmates at risk of serious injury and death.

85.     The TCJS inspected the El Paso County jail again on March 16, 2017. As a result of the inspection, which was a special inspection, the El Paso County Jail was determined to be non-compliant with minimum jail standards. It was thus listed at TCJS's website as being out of compliance. The TCJS determined that the El Paso County Jail was out of compliance for violating three minimum jail standards.

86.     First, a minimum standard requires that jail operators in Texas provide medical, mental, and dental services in accordance with an approved health services plan. Such services can include those of a licensed physician, professional and allied health personnel, hospital, or similar services. TCJS inspectors reviewed information received from the jail. They determined that inmate Norberto Santa Cruz answered "yes" to questions on the intake screening, thus indicating that he thought he could have withdrawals due to a history of alcohol and/or drug abuse. The

screening form indicated that medical was notified. However, there was no documentation to verify that Mr. Santa Cruz was referred to medical for withdrawal treatment.

87.     Inspectors also determined that the jail violated a minimum standard regarding procedures for intake screening to identify inmates who are known to be or observed to be disabled and/or potentially suicidal. Once again, regarding inmate Santa Cruz, he answered "yes" to questions on the intake screening form, which would require both a judge and a mental health professional to be notified.  El Paso County Jail officials confirmed that neither a judge nor a mental health professional were notified as required by TCJS standards.

88.     Third, TCJS inspectors determined that the El Paso County Jail violated the standard requiring having on-duty the appropriate number of jailers and the procedure for documented face-to-face observations of all inmates, who are on a typical watch, no less than once every 60 minutes. Documentation received by TCJS inspectors showed that jailers exceeded the 60-minute face-to-face observation of Mr. Santa Cruz by approximately 38 to 46 minutes. Mr. Santa Cruz was seen during a head count between 6:15 A.M. and 6:23 A.M. on a specific day, but was not seen face-to-face again by jailers until 8:01 A.M. The El Paso County Jail was warned that its failure to initiate and complete corrective measures following receipt of the notice of noncompliance for that inspection could result in issuance of a remedial order pursuant to Texas law.

89.     Less than three months later, from June 6 through 9, 2017, the TCJS inspected the El Paso County jail once again. Once again, the jail was found to be non-compliant and listed at the TCJS website in the short list of non-compliant jails. The El Paso County jail was warned once again that its failure to initiate and complete corrective measures following its receipt of a notice of noncompliance for the June 2017 inspection could result in issuance of a remedial order.

90.     The violation of standards continued with yet another issue of El Paso County jail staff failing to properly observe and check inmates. The minimum standard required that inmates confined in a holding or detoxification cell must be observed by jail personnel at intervals not to exceed 30 minutes. The TCJS inspector found, after reviewing 30-minute face-to-face observation logs for inmates in holding and detoxification cells at the downtown jail, that there were numerous occasions where El Paso County jail staff exceeded the 30-minute time period by as little as one minute and by as many as 55 minutes. This was a serious violation, as the failure to properly observe inmates can result in serious injury or death due to medical issues, suicide, and/or prisoner-on-prisoner assaults.

91.     The El Paso County jail was inspected once again by TCJS on October 30, 2017. It became abundantly clear that El Paso County would continue its failure to comply with minimum standards. The El Paso County jail was once again found to be non-compliant, and it was listed in the short list of county jails at the TCJS website which had a non-compliant status. One wonders why no remedial order issued, as El Paso County was warned again that its failure to cure its non-compliance could result in issuance of such a remedial order. As a result of the October 30, 2017 inspection, the TCJS listed, in the special inspection report, four minimum standards, which were violated by the county.

92.     First, El Paso County violated the minimum standard related to procedures for the distribution of prescriptions in accordance with written instructions from a physician, such distribution by an appropriate person designated by the sheriff/operator. After the inspector reviewed video and medical protocols regarding the distribution of medications, the inspector determined that jail medical staff failed to administer medication in accordance with protocol. Protocol required that medical staff observed inmates taking medications. However, after

reviewing video, the inspector determined that medical staff did not observe an inmate taking his medication.

93.     When investigating the in-custody death of inmate Robert Gallegos, the report noted that the investigator found that medications which were supposed to have been taken by him were simply sitting on a table in his cell. This is a serious violation, particularly with psychiatric medications, as the failure to minister such medications could result in inmate committing suicide. Likewise, common medications regarding chronic health issues must be taken to avoid serious injury or death.

94.     The second minimum standard which the TCJS found El Paso County Jail violated related to medical instructions of designated physicians being followed. After an inspector reviewed medication administration records for inmate Plecas-Perrin and a timeline provided by medical staff, the TCJS inspector determined that the inmate did not receive all of his medications per a physician's order.

95.     The third standard violated related to properly keeping health records, which reflect findings, diagnoses, treatment, and other related issues. After reviewing documentation received from El Paso County Jail medical staff, the TCJS inspector determined that there was not a medication administration record ("MAR") maintained of all medications dispensed to inmate Plecas-Perrin. There was a missing MAR that could not be located to verify that in fact Mr. Plecas-Perrin received his medications per a physician's order.

96.     Finally, the TCJS inspector determined that the El Paso County Jail violated the minimum standard related to observing inmates every 30 minutes, if such inmates are being held in an area due to inmates being known to be assaultive, potentially suicidal, mentally ill, or due to exhibiting bizarre behavior. After reviewing documentation and video, the TCJS inspector

determined that jailers failed to conduct face-to-face observation of inmates in separation cells in accordance with this minimum standard. Regarding Mr. Gallegos' death, the inspector confirmed and verified that inmates housed in pod 1400 cell block 10 are to be observed every 30 minutes. However, video and logs revealed that jail staff exceeded the 30-minute observation period by as few as 10 minutes and, unbelievably, by as many as 11 hours, 7 minutes. Upon information and belief, these were not isolated occurrences. The El Paso County jail's continued failure to comply with standards evidenced custom and practice which, at times, apparently deviated from its written policies.

97.     The TCJS inspected the El Paso County Jail again from June 18 through 22, 2018. Once again, the TCJS determined that the El Paso County Jail was not in compliance with minimum jail standards. Thus, the El Paso County Jail was listed in the short list of non-compliant Texas jails at the Texas Commission on Jail Standards website. Once again, the El Paso County jail was warned that it could be subject to a remedial order if it failed to take appropriate corrective measures.

98.     The TCJS inspectors cited the minimum jail standard regarding having an appropriate number of jailers on duty, and making appropriate face-to-face observation of inmates at appropriate intervals. The inspectors determined after reviewing 15-minute face-to-face observation of inmates who were potentially suicidal, that several welfare checks exceeded 15 minutes by as little as one minute and by as many as 40 minutes. This is wholly unacceptable, and in fact even a 15-minute check is insufficient. It takes as little as three minutes for a person to commit suicide through use of a ligature. More specifically, the inspection team noted that on some inmates, there were as many as 16 checks over the required 15-minute period in just one 12-hour shift. There were all also several recorded checks which were not legible.

99.     The TCJS inspected the El Paso County Jail again from June 15 through 19, 2020. The inspector had to provide technical assistance to the jail regarding classification of inmates. Jailers were misclassifying inmates on occasion by confusing pre-sentenced inmates with sentenced inmates. Appropriate classification is vitally important, as housing inmates in improper areas can lead to cell checks not being conducted as often as necessary, and a failure to protect inmates with self-harm tendencies.

100.     The TCJS inspected the El Paso County Jail again from June 7 through 9, 2021. During the inspection at the downtown jail, inmates in cell 610 complained of not receiving medication for the previous day as ordered by the prescribing physician. Jail staff provided as an excuse implementation of new software. However, this was insufficient to allow a lapse in properly administering medication to inmates. The inspector required the jail administration email to the inspector a plan of action within the following 14 days. The inspector also determined that none of the intercoms at the county courthouse were working as designed. It is vitally important that inmates be able to communicate with jail staff, in the event of an emergency or other needed medical care.

### 4.     Other Deaths Occurring at the El Paso County Jail

101.     The County was put on notice long ago that it must have in place appropriate policies, practices, and/or customs to avoid inmate suicides. It was put on notice of several issues, including the manner in which inmates typically commit suicide, the importance of continuous observation, and the need to assure that inmates with self-harm tendencies are not put into cells which have tie-off points and which contain items which could be used as ligatures.  The County was also put on notice of the need to observe inmates generally.

102.     On or about January 21, 2000, Joseph William Martin was found hanging in a protective custody cell. During a physical inspection of single-person cells, Jailer Marcos Soto observed Mr. Martin, hanging on the top of his rack/bed facing the back wall of the cell. Mr. Martin had used a blue seam from a cell mattress cover, to wrap it around his neck and form a ligature. He tied the other end of the ligature to a ceiling vent located directly above the rack/bed. A crime scene technician also recovered a razor in the cell, which Mr. Martin likely used to cut the seam off of the mattress cover.

103.     On or about September 2, 2000, while jailers were conducting a head count of the 11th floor inmate population, Jailer Carreon saw inmate Misty Marsh hanging from a vent inside her cell. Ms. Marsh had used a blue sheet as a ligature, tying one end around her neck and the other to the vent.

104.     On or about January 20, 2003, inmate Antonio Banda committed suicide in the El Paso County Jail. A jailer found Mr. Banda hanging from a ceiling smoke detector cover in cell 224. Mr. Banda had used a mattress cover sheet to form a ligature.

105.     On or about August 23, 2005, David Zacarias committed suicide in the El Paso County Jail. Mr. Zacarias was only 28 year old. Two jailers had found Mr. Zacarias attempting to hang himself. Mr. Zacarias, as had others described in this pleading, had used a dark blue cloth attached to a vent in the cell. Mr. Zacarias was transferred to a local hospital, where he subsequently died.

106.     On or about January 9, 2009, Rodell Robinson dies from suicide in the jail.  As with others referenced in this pleading, Mr. Rodell was found hanging through use of a ligature attached to the air vent in his cell. Mr. Rodell had used what inmates commonly use to form a ligature, his jail-issued uniform.

107.    On or about November 17, 2011, Leonel Renteria Carrillo committed suicide in the El Paso County jail. Mr. Carrillo used what was described in an incident sheet as a "blue strap" as a ligature. He tied one end of the strap to a wall light fixture and wrapped the other end around his neck.

108.    On or about May 1, 2012, El Paso County inmate Hector Alberto Aguilera passed away after being in the jail. Mr. Aguilera was booked into the jail at approximately 1:14 a.m. on April 29, 2012. He told the nurse on duty at intake that he was taking medication for anxiety, a sleeping disorder, panic attacks, and mental health issues. A breathalyzer test had indicated that Mr. Aguilera was nearly at the minimum level for legal intoxication. A urinalysis showed positive for likely illegal drugs. During classification, Mr. Aguilera was talking with slurred speech. A jailer noticed a white film on Mr. Aguilera's lower lip. Regardless, jail staff apparently did not seek any medical assistance. Instead, Mr. Aguilera was placed into a holding cell. Mr. Aguilera eventually stopped breathing and passed away at a local hospital.

109.    On or about May 26, 2012, El Paso County inmate Ramon Renteria committed suicide. A jailer, when conducting cell checks, found that Mr. Renteria had apparently covered a window to his cell with a large piece of paper and a brown towel. The jailer also noticed that the room light was off. After the jailer opened the cell door to investigate, he found Mr. Renteria hanging from a ligature, with one end tied around his neck and the other tied to a piece of metal on the door frame. This was yet another demonstration of inmates being creative as to tie-off points in cells. Actively suicidal inmates cannot be left in a cell with any tie-off points, and with clothing and/or other items with which they can form a ligature. El Paso County knew this well before the decedent's death in this case.

110.     On or about June 2, 2015, Jose Armando Diaz committed suicide in the El Paso County Jail. The inmate had apparently used a jail-issued razor, cutting one of his wrists, resulting in him bleeding to death.

111.     On or about March 4, 2017, El Paso County jail inmate Norberto Santa Cruz committed suicide in the jail. Mr. Santa Cruz committed suicide, in the most common way among inmates, through use of a ligature and hanging. As with other inmates, he used a jail-issued bed sheet, tying one end to a vent in his cell and the other around his neck.

112.     On or about May 31, 2017, El Paso County jail inmate Joshua Lopez committed suicide in the jail. Mr. Lopez used a jail-issued mattress cover, tying one end to the air vent and the other around his neck. This was yet another demonstration of the need to avoid putting suicidal inmates into cells with tie-off points and with items from which they could form a ligature.

113.     On or about May 30, 2018, Christopher Moreno committed suicide in the El Paso County Jail. Mr. Moreno had cut up jail-issued bed sheets, forming them into a ligature. He tied one end to a vent and the other end around his neck.

114.     On or about June 6, 2019, El Paso County Jail inmate Andre Feaster committed suicide in the jail. A jailer found Mr. Feaster hanging in his cell, with a strip of jail-supplied linen tied on one end around his neck, with the other end tied to a vent in the cell. Once again, El Paso County was put on notice of inmates using tie-off points and jail-supplied bedding to commit suicide.

115.     On or about November 25, 2019, Noel Dominguel Torres committed suicide in the El Paso County Jail. Mr. Torres had apparently used a brown towel, tying one end to a bed post and the other apparently around his neck. The custodial death report indicates that Mr. Torres was found hanging from his bunkbed support rail.

116.    On or about February 2, 2020, El Paso County Jail inmate Alberto Cesar Portillo passed away in the jail. Mr. Portillo was booked into the jail and notified jail staff that he had high blood pressure and alcohol addiction. He also indicated that his stomach was upset. The custodial death report seems to indicate that Mr. Portillo did not receive any treatment for his alcohol addiction, and Mr. Portillo died in a local hospital after being found unresponsive in his cell on February 2, 2020.

117.    On or about November 1, 2020, inmate Crystal Seymour committed suicide in the El Paso County Jail. Ms. Seymour used her jail-issued uniform pants legs, tying one end to a handicap bar on the wall in her cell and the other around her neck. This was not a novel manner in which to commit suicide, as inmates commonly use jail-issued clothing to do so. It is important that jails issue and require use of suicide smocks when inmates are actively suicidal.

118.    On or about December 24, 2021, Brandon Pacheco Calzada passed away in a local hospital after being incarcerated at the El Paso County Jail. Mr. Calzada was booked into the downtown jail on December 16, 2021, at 9:16 p.m. Upon information and belief, he died as a result of the jail's significant fentanyl distribution issues.

119.    On or about January 25, 2022, Gilbert Nunez died as a result of, upon information and belief, ingestion of fentanyl in the El Paso County downtown jail. On January 25, 2022, an El Paso County jailer was conducting physical checks on the eighth floor. At approximately 2:20 P.M., the jailer heard banging and yelling come from a certain tank. An inmate was yelling that help was needed in a specific cell. The jailer learned that Mr. Nunez was non-responsive. Mr. Nunez was housed in a single-person lockdown cell, and under 30-minute observation due to being on a suicide watch. Jailers ultimately recovered several, upon information and belief, fentanyl pills

from other inmates assigned to the same cell block. This was additional evidence of a significant known fentanyl problem in the El Paso County Jail.

120.    Robert John Barela died as a result of suicide after being in El Paso County Jail. While jailers were conducting a security check, on or about February 10, 2022, they saw Mr. Barela hanging from the ceiling by a bed sheet. Mr. Barela passed away on February 23, 2022, at a local hospital.

<u>5.    EPCSO Custom and Practice of Retaining Unfit Employees</u>

121.    The EPCSO continued to employ Corporal Amanda Brinks even after knowing that Corporal Brinks would not perform in a manner assuring the safety and security of inmates in the jail. It is customary in many sheriff's departments across Texas, including upon information and belief the EPCSO, that new recruits start working in the county jail and ultimately, if they desire to advance, enter the academy to become a sheriff's deputy. Upon information and belief, Corporal Brinks attempted to become a sheriff's deputy on more than one occasion. During one such occasion, in or about April 2004, Corporal Brinks was dismissed from the basic peace officer class. The EPCSO interoffice memorandum reads in part, "The dismissal is based on poor academic performance." A related memorandum, from Vince Pokluda, with the academy, recommended dismissal of Corporal Brinks from the academy. The memo indicated that Corporal Brinks failed two weekly exams with scores under 65%. It appears that the solution of the EPCSO was to allow Corporal Brinks to supervise other jailers. This unfortunately led to death of the decedent.

122.    An August 24, 2005 letter of reprimand indicated that Ms. Brinks violated EPCSO written policy. As with other letters of reprimand mentioned in this complaint, the sheriff of El Paso County signed the letter. This letter indicates that, on or about May 26, 2005, she neglected her duties. She had been late for work five times over a two-and-a-half month period.

123.    A February 14, 2007 letter of suspension indicated that Ms. Brinks violated EPCSO written policy. It indicated that, on or about December 22, 2006, she neglected her duties. Further, this was the 18th time in a 12-month period that Ms. Brinks was late for briefing and or duty. Further, on two occasions, she was over one hour late for work. This is further indication of Ms. Brink's custom and practice of being lax in the jail and giving short shrift to her duties.

124.    A March 6, 2007 letter of suspension, signed by the sheriff of El Paso County, indicates that then-detention officer Brinks violated policies at the EPCSO. The letter indicates that, on or about January 29, 2007, January 30, 2007, and February 13, 2007, she arrived late for briefing. The letter also indicates that, on August 24, 2005, she had received a letter of reprimand for being late to work on five occasions in a three-month period. The letter also indicates that, on February 14, 2007, Ms. Brinks received a one-day suspension for being late for briefing 18 times during the 2006 calendar year. The letter also read, "Your consistent inefficiency has caused this stern discipline." The letter also indicates that her conduct adversely affected the morale or efficiency of the sheriff's office, and that Ms. Brinks engaged in conduct and communication that were detrimental and had an adverse effect at the workplace. Regardless, the EPCSO continued to employ Ms. Brinks and in fact promote her at some point.

125.    A March 14, 2007 letter of suspension indicates that then-detention officer Brinks was lax and dishonest. Regardless, the EPCSO continued to employ her through and including Azahlia's death. The letter indicates that, on or about February 13, 2007, while on duty, she engaged in prohibited conduct by using the workstation phone more than 20 times to conduct personal business regarding an improper relationship. The letter indicates that this resulted in her "lack of focus." The letter also indicates that, on or about February 27, 2007, then detention officer Brinks admitted that she was not truthful in her statement to internal affairs on February 14, 2007

regarding having a relationship with another detention officer. She also admitted that she was not truthful when she denied calling that detention officer numerous times using the workstation phone at the jail.  The letter also indicates that, on about February 13, 2007, then-detention officer Brinks violated Texas Penal Code 42.06, False Alarm or Report, when she filed a harassment charge against someone related to the person with who she was having a relationship, knowing that such report was without merit.  The letter reads in part, "The police report contained statements that were untrue by your own admission and subsequent statements provided by you to the Internal Affairs investigators." The letter was signed by the sheriff of El Paso County. Regardless of the serious lapses in judgment, and criminal conduct, and giving short-shrift to work duties, the EPCSO continued to employ Ms. Brinks. This ultimately resulted in Azahlia's death.

126.    A December 10, 2008 letter of reprimand indicates that Corporal Brinks had issues with arriving at work on time. The letter indicates that, on or about July 23, 2008, she neglected her duties and failed to perform all of her assigned duties and responsibilities consistent with reasonable and customary standards. She was late for duty approximately two minutes that date, and she had been late for duty approximately six times that year. Upon information and belief, this custom or practice may have continued up through and including the time of a Azahlia's suicide. Corporal Brinks failing to show up for her position and be ready to work, which appears not to be the case when considering her description of just arriving at the jail at the time of Azahlia's issue, was upon information and belief a cause of Azahlia's death.

127.    Another performance evaluation for Ms. Brinks referenced a September 3, 2013 incident. The supervisor noticed, when reviewing an activity sheet for pod 1000, that there were no physical checks from 7:55 A.M. to 9:25 A.M. The note also read, "This is unacceptable and

will not be tolerated in the future." However, it was clearly tolerated, as Ms. Brinks continued to be employed in not only a jailer position, but a supervisory position.

128.    A performance review indicates that, on or about November 7, 2016, a supervisor orally counseled Ms. Brinks on her "inability to come in to work on time." The supervisor explained to her at that time that she had a history of always coming in late even before her current alleged problems at home. The note further indicated that Ms. Brinks had been previously warned on several occasions by that supervisor, Sergeant Navar, and at the time Lieutenant Romero. The supervisor explained to her that such "consistent unprofessional behavior would not be tolerated." Further, on the date the review was discussed with Ms. Brinks, the supervisor had an extensive conversation with her and recommended that she seek help on a higher level in reference to her alleged personal problems. Since then, she arrived at work late four additional times. She was given a direct order to arrive at work and to her assigned pod on time, and she failed to do so since that 2016 conversation on several occasions.  Regardless of Ms, Brinks' giving short shrift to her duties to assure the security and safety of prisoners, the EPCSO continued to employ her. In fact, in that review, referencing her as a direct supervisor in the jail, she was encouraged to "develop and improve her role as a direct supervisor and distinguish the differences concerning her personal life and her ability to manage subordinates during work hours." The EPCSO's decision to continue to employ her endangered and caused the death of Azahlia.

129.    A March 12, 2020 letter of suspension directed to Corporal Brinks indicates that she improperly used OC spray with an inmate. During a struggle with an inmate, with another detention officer involved, Corporal Brinks sprayed OC spray directly into the face of an inmate much closer than the recommended minimum distance of 36 inches.

130.    Further, on May 29, 2021, Corporal Brinks was assigned to pod 1000. She failed to scan cells 1021 and 1023 at 6:00 P.M. This resulted in the next cell check exceeding the 60-minute requirement rule for a general population cell block. Further, on June 16, 2021, Corporal Brinks was assigned to pod 1500 at the jail annex. This is an administrative segregation pod requiring, pursuant to written policy, checks every 30 minutes. During the 12:10 P.M. physical check, Corporal Brinks became distracted and failed to scan the top and bottom tier cell doors in cell block 1505, including the top tier cell doors in three cell blocks. Also, during the 1:00 P.M. physical check, she failed to scan the lower tier cell doors in cell block 1505 and also failed to scan 11 cell doors during the 6:00 PM physical check. As a result, the time between physical checks exceeded the required 30 minutes. The document read in part, "Your failure to conduct physical checks as required constitutes neglective duty and is in violation of TCJs regulations and Office Policy." The letter of suspension was signed by Richard D. Wiles, Sheriff of El Paso County.

131.    A July 11, 2021 letter of reprimand resulted in, upon information and belief, a reprimand of Corporal Brinks as a result of Azahlia's death. However, as is evidenced by further letters and counseling short of termination, written reprimands in counseling were simply to attempt to avoid liability for the County of its employees' consistent and customary conscious disregard for prisoners' rights.  The letter of reprimand read in part that Corporal Brinks was, on March 1, 2021, the corporal assigned to pod 1500 from 7:00 P.M. to 7:00 A.M. The letter also indicated that Corporal Brinks "placed an inmate on observation in hold over cell pending being placed in a smock." The letter further indicated that, when Corporal Brinks made face-to-face observations of Azahlia at 7:01 P.M., 7:15 P.M., and 7:30 P.M., Corporal Brinks did not use the scan pipe touch button to provide proof that Azahlia had in fact been seen. The letter also read in part, "Your conduct constitutes neglective duty in violation of Office Policy and the Sandra Bland

Act." However, Corporal Brinks was not reprimanded for failing to observe Azahlia continuously, for allowing Azahlia to be in a cell, while actively suicidal, in jail-issued clothing, or not assuring that Azahlia was only left without continuous observation after she was in a cell with no tie-off points and with no items with which she could form a ligature. This is some evidence of preexisting custom and practice supporting Monell claims against El Paso County.

132.   A July 26, 2021 letter of demotion, signed by Richard Wiles, Sheriff of El Paso County, advised then-Corporal Brinks that a demotion from the rank of corporal to detention officer may be warranted. The letter indicated that, on April 18, 2021, then-Corporal Brinks was the corporal assigned to administrative segregation pod 1500 at the jail annex with two trainees. A review of the Guard I report indicated a physical security check was late during the 12:15 P.M. hour. The letter reminded then-Corporal Brinks that physical checks are required at least every 30 minutes in administrative segregation pod. The Guard I report revealed that between 12:00 P.M. and 1:00 P.M., numerous cell checks exceeded the 30 minutes by as few as eight seconds to as much as one minute and 26 seconds. Further, Corporal Brinks ordered her assigned male trainee, who was assigned to the guard station, to falsify an entry on the daily activity report. She instructed him to document the physical check was late due to a problematic inmate and not as a result of Corporal Brinks feeding prisoners. The letter read in part, supporting the EPCSOs knowledge of Corporal Brinks laxness before Azahlia's death, "you continue to be consistently inefficient in the performance of your duties as a supervisor."  The County merely considered a demotion after years of serious issues with Ms. Brinks, and after directing commission of a felony.

133.   Upon information and belief, Corporal Brinks' deliberate indifference to her job duties and the safety and security of prisoners in the jail occurred well before Azahlia's death. However, even after Azahlia's death, events documented in Corporal Brinks personnel file

indicate, upon information and belief, a pattern and practice which pre-existed Azahlia's death, of which the EPCSO was aware, and which ultimately was a cause of Azahlia's death. A letter of suspension dated September 9, 2021 contained a number of infractions supporting pre-existing practices and customs. That letter indicates that, on May 25, 2021, Corporal Brinks was assigned to pod 1600. She failed to scan two cells at 7:10 A.M., resulting in the next prisoner check exceeding the 60-minute requirement rule for a general population cell block. Moreover, on May 28, 2021, she was assigned to pod 1500. She was late scanning 14 cells at 5:17 P.M. and 5:18 P.M., and she also failed to scan a cell at 1:25 P.M. This resulted in the time between scan checks exceeding the 30-minute requirement rule for an administrative separation cell block.

134. The EPCSO personnel file for Stacie Telles contains documents further showing the EPCSO's pattern and practice of reprimanding employees, but continuing to employ them. This results in employees being fed back into the workplace, when instead they should be terminated. A June 3, 2020 letter of suspension indicates that Ms. Telles violated written policy. On May 1, 2020, she was assigned to pod 1600 at the jail annex. During her assignment, she possessed her personal cellphone. Such cell telephones were prohibited in secured areas, such as pod 1600. The letter was signed by Sheriff Wiles.

135. Further, an August 5, 2020 letter of suspension indicates that Ms. Telles violated written policy. On June 13, 2020, she was assigned to pod 1400 at the jail annex. She conducted an observation check of an inmate in conjunction with a physical check. On the observation sheet, she documented that the inmate was awake and lying down in his cell. The inmate was not in his cell at all, but had managed to open his door and was hiding in the shower area. She lied on the sheet. The letter improperly gave Ms. Telles the benefit of the doubt by indicating that she was careless in conducting the check. In fact, she committed a felony by falsifying a government

document, indicating that an inmate was in a location and doing something where the inmate was not and was not doing. A simple short suspension was considered by the EPCSO to be sufficient for commission of such a felony, which endangered the life of that inmate. Ms. Telles would then, upon information belief, return to duty after her several day suspension.

III.    Causes of Action

    A.    14th Amendment Due Process Claims Under 42 U.S.C. § 1983: Objective Reasonableness Pursuant to *Kingsley v. Hendrickson*

136.    In *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), a pretrial detainee sued several jail officers alleging that they violated the 14th Amendment's Due Process Clause by using excessive force against him. *Id*. at 2470. The Court determined the following issue: "whether, to prove an excessive force claim, a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officer's use of that force was *objectively* unreasonable." *Id.* (emphasis in original). The Court concluded that the objectively unreasonable standard was that to be used in excessive force cases, and that an officer's subjective awareness was irrelevant. *Id.* The Court did so, acknowledging and resolving disagreement among the Circuits. *Id.* at 2471-72.

137.    The Court flatly wrote "the defendant's state of mind is not a matter that a plaintiff is required to prove." *Id.* at 2472. Instead, "courts must use an objective standard." *Id* at 2472-73. "[A] pretrial detainee must show only that the force purposefully or knowingly used against him was objectively unreasonable." *Id.* at 2473. Thus, the Court required no *mens rea*, no conscious constitutional violation, and no subjective belief or understanding of offending police officers, or jailers, for an episodic claim but instead instructed all federal courts to analyze officers', or jailers', conduct on an objective reasonability standard. Since pretrial detainees' rights

to receive reasonable medical and mental health care, to be protected from harm, and not to be punished at all, also arise under the 14th Amendment's Due Process Clause, there is no reason to apply a different standard when analyzing those rights.

138.   Thus, the trail leads to only one place – an objective unreasonableness standard, with no regard for officers' or jailers' subjective belief or understanding, should apply in this case and all pretrial detainee cases arising under the Due Process Clause of the 14th Amendment.  The Fifth Circuit, and the district court in this case, should reassess Fifth Circuit law in light of *Kingsley* and apply an objective unreasonableness standard to constitutional claims in this case.  The court should not apply a subjective state of mind and/or deliberate indifference standard.  The Supreme Court discarded the idea that a pretrial detainee should have such a burden.

### B.    Remedies for Violation of Constitutional Rights

139.   The United States Court of Appeals for the Fifth Circuit has held that using a state's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983.   Therefore, Plaintiffs individually, and on behalf of Wrongful Death Beneficiaries and Claimant Heirs, seeks, for causes of action asserted in this complaint, all remedies and damages available pursuant to Texas and federal law, including but not necessarily limited to the Texas wrongful death statute (Tex. Civ. Prac. & Rem. Code § 71.002 *et seq.*), the Texas survival statute (Tex. Civ. Prac. & Rem. Code § 71.021), the Texas Constitution, common law, and all related and/or supporting case law.  If the decedent would had lived, the decedent would have been entitled to bring a 42 U.S.C. § 1983 action for violation of the United States Constitution and obtain remedies and damages provided by Texas and federal law.  Plaintiffs incorporate this remedies section into all sections in this complaint asserting cause(s) of action.

C.    Cause of Action Against Individual Defendants Under 42 U.S.C. § 1983 for Violation of Constitutional Rights

140.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Individual Defendants are liable to Plaintiffs individually, Claimant Heirs, and Wrongful Death Beneficiaries, pursuant to 42 U.S.C. § 1983, for violating the decedent's rights to reasonable medical/mental health care, to be protected, and/or not to be punished as a pretrial detainee.  These rights are guaranteed by at least the 14th Amendment to the United States Constitution.  Pre-trial detainees are also entitled to protection, and also not to be punished at all since they have not been convicted of any alleged crime resulting in their incarceration.

141.    Individual Defendants acted and failed to act under color of state law at all times referenced in this pleading.  They wholly or substantially ignored the decedent's obvious serious mental health issues and/or self-harm tendencies, and they were deliberately indifferent to and acted in an objectively unreasonable manner regarding those needs.  They failed to protect the decedent, and their actions and/or inaction referenced in this pleading resulted in unconstitutional punishment of the decedent.  Individual Defendants were aware of the excessive risk to the decedent's health and safety and were aware of facts from which an inference could be drawn of serious harm, suffering, and death.  Moreover, they in fact drew that inference.  Individual Defendants violated clearly–established constitutional rights, and their conduct was objectively unreasonable in light of clearly–established law at the time of the relevant incidents.

142.    Individual Defendants are also liable pursuant to the theory of bystander liability.  Bystander liability applies when the bystander jailer/officer (1) knows that a fellow jailer/officer

is violating a person's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act.  As demonstrated through facts asserted in this pleading, Individual Defendants' actions and inaction meet all three elements.  They are therefore also liable to Plaintiffs individually, Claimant Heirs, and Wrongful Death Beneficiaries pursuant to this theory.

143.    In the alternative, Individual Defendants' deliberate indifference, conscious disregard, state of mind, subjective belief, subjective awareness, and/or mental culpability are irrelevant to determination of constitutional violations set forth in this section of this pleading. The United States Supreme Court, in *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), determined the state of mind necessary, if any, for officers/jailers sued in a case alleging excessive force against a pretrial detainee in violation of the 14th Amendment's Due Process Clause.  *Id* at 2470-71.  Constitutional rights set forth in this section of the pleading, and constitutional rights affording pretrial detainees protection against excessive force, all flow from the 14th Amendment's Due Process Clause.  *Id.*  Since such constitutional protections flow from the same clause, the analysis of what is necessary to prove such constitutional violations is identical.

144.    Individual Defendants are not entitled to qualified immunity.[1]  Their failure to protect the dededent, and other actions and/or inaction referenced in this pleading, caused,

---

[1]    The defense of qualified immunity is, and should be held to be, a legally impermissible defense. In the alternative, it should be held to be a legally impermissible defense except as applied to state actors protected by immunity in 1871 when 42 U.S.C. § 1983 was enacted.  Congress makes laws. Courts do not.  However, the qualified immunity defense was invented by judges.  When judges make law, they violate the separation of powers doctrine, and the Privileges and Immunities Clause of the United States Constitution.  Plaintiffs respectfully make a good faith argument for the modification of existing law, such that the court–created doctrine of qualified immunity be abrogated or limited.

Individual Defendants cannot show that they are entitled to qualified immunity.  This should be Individual Defendants' burden, if they choose to assert the alleged defense.  Qualified immunity, as applied to persons not immunized under common or statutory law in 1871, is

proximately caused, and/or were producing causes of the decedent's suffering and death and other damages mentioned and/or referenced in this pleading, including but not limited to those suffered by Plaintiffs individually, Claimant Heirs, and Wrongful Death Beneficiaries.

145.    Therefore, the decedent's estate and/or his heirs at law (Claimant Heirs) suffered the following damages, for which they seek recovery from Individual Defendants:

- the decedent's conscious physical pain, suffering, and mental anguish;

- the decedent's loss of life and/or loss of enjoyment of life;

- the decedent's medical expenses;

- the decedent's funeral expenses; and

- exemplary/punitive damages.

---

untethered to any cognizable legal mandate and is flatly in derogation of the plain meaning and language of Section 1983. *See Ziglar v. Abassi*, 137 S. Ct. 1843, 1870-72 (2017) (Thomas, J., concurring). Qualified immunity should have never been instituted as a defense, without any statutory, constitutional, or long-held common law foundation, and it is unworkable, unreasonable, and places too high a burden on Plaintiffs who suffer violation of their constitutional rights. Joanna C. Schwartz, *The Case Against Qualified Immunity,* 93 Notre Dame L. Rev. 1797 (2018) (observing that qualified immunity has no basis in the common law, does not achieve intended policy goals, can render the Constitution "hollow," and cannot be justified as protection for governmental budgets); and William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45, 82 (2018) (noting that, as of the time of the article, the United States Supreme Court decided 30 qualified immunity cases since 1982 and found that defendants violated clearly established law in only 2 such cases). Justices including Justice Thomas, Justice Breyer, Justice Kennedy, and Justice Sotomayor have criticized qualified immunity. *Schwartz, supra* at 1798–99. *See also Cole v. Carson*, _ F.3d _, 2019 WL 3928715, at * 19-21, & nn. 1, 10 (5th Cir. Aug. 21, 2019) (en banc) (Willett, J., Dissenting). Additionally, qualified immunity violates the separation of powers doctrine of the Constitution. *See generally* Katherine Mims Crocker, *Qualified Immunity and Constitutional Structure*, 117 Mich. L. Rev. 1405 (2019) (available at https://repository.law.umich.edu/mlr/vol117/iss7/3). Plaintiffs include allegations in this footnote to assure that, if legally necessary, the qualified immunity abrogation or limitation issue has been preserved.

146.    Plaintiffs and Wrongful Death Beneficiaries also individually seek and are entitled to all remedies and damages available to each such person individually for 42 U.S.C. § 1983 claims.  They seek such damages as a result of the wrongful death of their daughter or mother, as applicable.  Those damages were caused and/or proximately caused by Individual Defendants. Therefore, their actions caused, were a proximate cause of, and/or were a producing cause of the following damages suffered by these people, for which they individually seek compensation, each as legally appropriate:

- loss of services that the decedent's parents would have received from the decedent;

- expenses for the decedent's funeral;

- past mental anguish and emotional distress suffered as a result of the decedent's death;

- future mental anguish and emotional distress suffered as a result of the decedent's death;

- loss of companionship and/or society that they would have received from the decedent; and

- exemplary/punitive damages.

Exemplary/punitive damages are appropriate in this case to deter and punish clear and unabashed violation of the decedent's constitutional rights.  Individual Defendants' actions and inaction showed a reckless or callous disregard of, or indifference to, the decedent's rights and safety. Moreover, Plaintiffs individually, Claimant Heirs, and Wrongful Death Beneficiaries seek reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

D.    Cause of Action Against the County Under 42 U.S.C. § 1983 for Violation of Constitutional Rights

147.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating

all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, the County is liable to Plaintiffs individually, Claimant Heirs, and Wrongful Death Beneficiaries, pursuant to 42 U.S.C. § 1983, for violating the decedent's rights to reasonable medical/mental health care, to be protected, and/or not to be punished as a pre-trial detainee. These rights are guaranteed by at least the 14th Amendment to the United States Constitution. Pretrial detainees are entitled to be protected and not to be punished at all, since they have not been convicted of any alleged crime resulting in their incarceration.

148.    The County acted or failed to act, through natural persons including Individual Defendants, under color of state law at all relevant times. The County's policies, practices, and/or customs were moving forces behind and caused, were producing causes of, and/or were proximate causes of the decedent's suffering, damages, and death, and all damages suffered by Plaintiffs individually, Claimant Heirs, and Wrongful Death Beneficiaries.

149.    The Fifth Circuit Court of Appeals has made it clear that Plaintiffs need not allege the appropriate chief policymaker at the pleadings stage. Nevertheless, out of an abundance of caution, the sheriff of the County was the County's relevant chief policymaker over matters at issue in this case. Moreover, in addition, and in the alternative, the County jail administrator was the relevant chief policymaker over matters at issue in this case. Finally, in addition, and in the alternative, the County's commissioners' court was the relevant chief policymaker.

150.    The County was deliberately indifferent regarding policies, practices, and/or customs developed and/or used with regard to issues addressed by allegations set forth above. It also acted in an objectively unreasonable manner. Policies, practices, and/or customs referenced above, as well as the failure to adopt appropriate policies, were moving forces behind and caused

violation of the decedent's rights and showed deliberate indifference to the known or obvious consequences that constitutional violations would occur. The County's relevant policies, practices, and/or customs, whether written or not, were also objectively unreasonable as applied to the decedent.

151. Therefore, the decedent's estate and/or his heirs at law (Claimant Heirs) suffered the following damages, for which they seek recovery, through the administrator, from the County:

- the decedent's conscious physical pain, suffering, and mental anguish;

- the decedent's loss of life and/or loss of enjoyment of life;

- the decedent's medical expenses; and

- the decedent's funeral expenses.

152. Plaintiffs and Wrongful Death Beneficiaries also individually seek and are entitled to all remedies and damages available to each such person individually for the 42 U.S.C. § 1983 violations. They seek such damages as a result of the wrongful death of their daughter or mother, as applicable. The County's policies, practices, and/or customs caused, were proximate and/or producing causes of, and/or were moving forces behind and caused the following damages suffered by these people, for which they individually seek compensation:

- loss of services for the decedent's parents;

- expenses for the decedent's funeral;

- past mental anguish and emotional distress resulting from the decedent's death;

- future mental anguish and emotional distress resulting from the decedent's death; and

- loss of companionship and/or society that they would have received from the decedent.

Moreover, Plaintiffs individually, Claimant Heirs, and Wrongful Death Beneficiaries seek reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

## IV.     Concluding Allegations and Prayer

### A.     Conditions Precedent

153.    All conditions precedent to assertion of all claims herein have occurred.

### B.     Use of Documents at Trial or Pretrial Proceedings

154.    Plaintiffs individually, Claimant Heirs, and Wrongful Death Beneficiaries intend to use at one or more pretrial proceedings and/or at trial all documents produced by Defendants in this case in response to written discovery requests, with initial disclosures (and any supplements or amendments to same), and in response to Public Information Act request(s).

### C.     Jury Demand

155.    Plaintiffs individually, Claimant Heirs, and Wrongful Death Beneficiaries demand a jury trial on all issues which may be tried to a jury.

### D.     Prayer

156.    For these reasons, Plaintiffs individually, Claimant Heirs, and Wrongful Death Beneficiaries ask that Defendants be cited to appear and answer, and that Plaintiffs individually, Claimant Heirs, and Wrongful Death Beneficiaries have judgment for damages within the jurisdictional limits of the court and against all Defendants, jointly and severally, as legally available and applicable, for all damages referenced above and below in this pleading:

      a)    actual damages of and for Plaintiffs individually, Claimant Heirs, and Wrongful Death Beneficiaries, including but not necessarily limited to:

          •    loss of services for the decedent's parents;

- medical expenses for the decedent;

- expenses for the decedent's funeral;

- past mental anguish and emotional distress resulting from and caused by the decedent's death;

- future mental anguish and emotional distress resulting from and caused by the decedent's death;

- the decedent's conscious physical pain, suffering, and mental health anguish;

- the decedent's loss of life and/or loss of enjoyment of life; and

- loss of companionship and/or society that they would have received from the decedent;

b)   exemplary/punitive damages for Plaintiffs individually, Claimant Heirs, and Wrongful Death Beneficiaries, from Individual Defendants;

c)   reasonable and necessary attorneys' fees for Plaintiffs individually, Claimant Heirs, and Wrongful Death Beneficiaries, through trial and any appeals and other appellate proceedings, pursuant to 42 U.S.C. §§ 1983 and 1988;

d)   court costs and all other recoverable costs;

e)   prejudgment and postjudgment interest at the highest allowable rates; and

f)   all other relief, legal and equitable, general and special, to which Plaintiffs individually, Claimant Heirs, and Wrongful Death Beneficiaries are entitled.

Respectfully submitted:


Law Offices of Dean Malone, P.C.


　　　　/s/ T. Dean Malone　　　　　　
T. Dean Malone

T. Dean Malone
Attorney-in-charge
dean@deanmalone.com
Texas State Bar No. 24003265
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:　(214) 670-9989
Telefax:　　(214) 670-9904

Of Counsel:

Michael T. O'Connor
Texas State Bar No. 24032922
michael.oconnor@deanmalone.com
Kristen Leigh Homyk
Texas State Bar No. 24032433
kristen.homyk@deanmalone.com
Brandie A. Moser
Texas State Bar No. 24123223
brandie.moser@deanmalone.com
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:　(214) 670-9989
Telefax:　　(214) 670-9904

Attorneys for Plaintiffs